**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RICHARD ALLEN, CLARENCE ALVORD, CLIFFORD HARRELSON, LON HEBERT, JOHN TILLY, DEWAYNE RECTOR, HENRY SEPPI and KEVIN GARTHE, individually and on behalf of all others similarly situated,** ) ) ) ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **No. 06 C 5932** |
| **AMERICAN HONDA MOTOR COMPANY, INC. and HONDA OF AMERICA MANUFACTURING, INC.,** ) ) ) ) | **Magistrate Judge Nan R. Nolan** |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Richard Allen, Clarence Alvord, Clifford Harrelson, Lon Hebert, John Tilly, DeWayne Rector, Henry Seppi and Kevin Garthe all purchased GL1800 Gold Wing Motorcycles manufactured by Defendants American Honda Motor Company, Inc. ("American Honda") and Honda of America Manufacturing, Inc. ("HAM") (collectively, "Honda"). In this diversity lawsuit, Plaintiffs allege breaches of express and implied warranties arising from Honda's deceptive and unlawful conduct in designing, manufacturing, marketing, distributing, selling, servicing and/or failing to service those motorcycles. Plaintiffs now seek to certify two classes of similarly situated motorcycle owners under Federal Rule of Civil Procedure 23(b)(3). Defendants object to class certification and also seek to exclude the testimony of Mark Ezra, Plaintiffs' designated expert. For the reasons set forth here, Defendants' motion to exclude is denied without prejudice, and Plaintiffs' motion for class certification is granted in part and denied in part.

<u>**BACKGROUND**</u>[1]

Honda first began selling its luxury touring Gold Wing GL motorcycles in 1975. The GL1800 model at issue here has been on the market since 2000. Plaintiffs each purchased GL1800 motorcycles and received American Honda's standard written warranty accompanying all sales. In that warranty, American Honda guarantees that the purchased motorcycle is "free from defects in materials and workmanship," and further provides that "American Honda will repair or replace, at its option, any part that is found defective in material or workmanship under normal use." (Ex. 5 to Pl. Mem., at MOTORSPORTS 000051-62.)

**A.     The Gold Wing "Wobble"**

As a matter of physics, all motorcycles exhibit a phenomenon called "wobble" – *i.e.*, an oscillation of the front steering assembly about the steering axis. This lawsuit turns on Plaintiffs' assertion that in order to ensure rider safety, motorcycles must have sufficient stiffness in the steering assembly to compensate for the wobble, meaning that the naturally-occurring oscillations "decay" or "dampen" adequately enough that the rider does not need to react to them.

**1.     Plaintiffs' Theory**

Plaintiffs claim that the GL1800 model has a design defect that prevents the adequate damping of wobble that occurs at low speeds between 25 and 40 miles per hour ("mph"). In support of this position, Plaintiffs rely almost entirely upon the opinion of Mark Ezra of MK & Associates. Mr. Ezra, a motorcycle engineering expert, believes that wobble must decay within ½ to 3/4 of a second. This means that "the oscillations should reduce to one-third of their peak size in one-half to three-fourths of one second, and then repeat that process every one-half to three-fourths of a second so that they rapidly reach the point at which the oscillations cannot be felt." (Pl. Mem., at 7.)

---

[1]     The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Mr. Ezra concedes that there is no government or industry-wide standard for motorcycle stability. He thus created his own standard "by combining his knowledge of human reaction time with his knowledge of wobble." (Pl. Expert Resp., at 6.) Specifically, motorcycle wobble most often occurs at frequencies between 6 Hz (Hertz) and 10 Hz (6 to 10 oscillations per second). This is much faster than rider reaction time, which is generally accepted to be 3/4 of a second. To ensure rider safety, Mr. Ezra opines, a motorcycle's steering assembly must be sufficiently stiff to adequately dampen wobble "so that the rider neither reacts to nor is frightened by the oscillations." (*Id.* at 6-7; Pl. Mem., at 6.) In that regard, Mr. Ezra proposes that wobble oscillation "should decay to 37% of its original amplitude within one-half to three-quarters of a second." (*Id.*)

Mr. Ezra first conceived this wobble decay standard in the mid-1980s for a lawsuit against Honda in which he was a testifying expert. (Ezra Dep., at 125.) He also published the standard in the June 2004 issue of the *Journal of the National Academy of Forensic Engineers*. To determine whether the GL1800 meets his wobble decay standard, Mr. Ezra tested one used GL1800 that was owned by Clifford Harrelson and adjusted to factory specifications. A test rider drove the motorcycle in a paved parking lot and accelerated to target speeds of 30, 35, 40 and 45 mph. The test rider then set the cruise control, removed his hands and induced a wobble by slapping the right side grip with the palm of his hand. (Ezra Report, at 15.)

Mr. Ezra outfitted the GL1800 with devices to measure the wobble decay, with the bike set in four configurations: (1) with its existing, non-original equipment manufacturer ("OEM") used Metzler tires installed by Mr. Harrelson, and its existing steering stem ball bearings; (2) with its existing non-OEM Metzler tires and new tapered roller bearings; (3) with new Bridgestone tires and its existing steering stem ball bearings; and (4) with new Bridgestone tires and new tapered roller bearings. Ultimately, Mr. Ezra excluded results produced with the Metzler tires, and looked only to the two configurations with Bridgestone tires. By way of comparison, Mr. Ezra conducted similar tests of a used Harley-Davidson 2007 Road Glide and a 2007 BMW R1200RT. (*Id.* at 14-15.) He

did not, however, install ball bearings in the Harley-Davidson or the BMW to test their performance with that equipment.  (*Id.* at 13.)

Based on these tests, Mr. Ezra opines that the GL1800 motorcycle fails to meet the wobble decay standard.  In Mr. Ezra's view, the ball bearing in the motorcycle frame's head pipe is not stiff enough to dampen the wobble, and should be replaced with a tapered roller bearing, which can be torqued to a higher level (30 ft. lbs. as compared with 21 ft. lbs. for the ball bearing.)  (Pl. Mem., at 8, 9.)  Plaintiffs object that despite this easy fix, Honda has refused to replace the bearing itself or pay for the cost of doing so.

### 2.    Honda's Theory

Honda counters that it has received only isolated complaints of wobble which do not reflect a fleet-wide problem with the GL1800 model.  Honda monitors customer complaints and inquiries through (1) a customer support department with a toll-free telephone number; (2) a "techline" for dealers to report consumer complaints or concerns; and (3) District Service Managers responsible for visiting dealerships and addressing product concerns.  All customer and "techline" contacts, and some District Service Manager communications are documented in Honda's Customer Relations Management System ("CRMS") database.  Honda also monitors information received through its warranty system.

### B.    Plaintiffs' Experiences

Plaintiffs claim that their personal experiences with the GL1800 wobble problem are typical of other purchasers.  Richard Allen first noticed a wobble on his 2002 GL1800 Gold Wing while riding the motorcycle home from the dealership.  He describes the condition as a "violent shaking of the front wheel" on deceleration between 30 and 45 mph.  Mr. Allen has substantial motorcycle riding experience, including as a law enforcement officer, and he says that he never experienced a wobble prior to owning the GL1800.  Mr. Allen complained to his Honda dealer, who advised him

that Honda "rejected payment" on attempted wobble repairs. He has not replaced the ball bearings and the motorcycle still wobbles.

John Tilly has owned two GL1800 motorcycles (a 2003 model and a 2006 model). Mr. Tilly first noticed a wobble on his 2003 model shortly after purchase, explaining that the handlebars would "oscillate" and "didn't quite feel right, and then . . . startled me and scared me a little bit" during deceleration under 45 mph. (Tilly Dep., at 15-16.) Mr. Tilly experienced a similar oscillation on his 2006 model, but the wobble stopped when he replaced the ball bearings with tapered ones. (*Id.* at 16, 63, 83.) A Honda dealer told Mr. Tilly that the company would not pay for tapered bearings on his 2003 model, and he did not expect a better response as to his 2006 model. (*Id.* at 19-21, 35-36, 85.)

Lon Hebert, an experienced rider, noticed a "severe" front-end wobble on his 2005 GL1800 after putting about three to four thousand miles on the motorcycle. Mr. Hebert stated that "[o]n deceleration, about 30 to 40 miles an hour, my handlebars would shake and shimmy." (Hebert Dep., at 6.) He complained to his Honda dealer, who said there was "nothing they could do about it." (*Id.* at 38-39, 60-61.) The dealership charged Mr. Hebert an installation fee to replace the front tire, but this did not eliminate the wobble. Mr. Hebert ultimately solved the problem by replacing the existing bearings with tapered bearings, but Honda has refused to pay for the repairs. (*Id.* at 47-48.)

Clifford Harrelson experienced a wobble on his 2006 GL1800 as he was leaving the dealership. Specifically, the handlebars oscillated "from right to left or from left to right" at speeds of around 30 to 40 mph. (Harrelson Dep., at 18-19.) Mr. Harrelson has a lifetime of riding experience and has never noticed a wobble on his other motorcycles. He asked the Honda dealership's service manager if there were any plans to replace the ball bearings with tapered bearings, but he "got the feeling [he] was being blown off or brushed off." (*Id.* at 6-9, 28-30, 65.)

MK & Associates installed tapered bearings on Mr. Harrelson's motorcycle and it no longer wobbles.

DeWayne Rector noticed a wobble on his 2005 GL1800 after putting approximately 8,000 miles on the motorcycle. He explained that "on deceleration . . . initially once you dropped below 35 mile an hour if you did not have your hand on the handlebars or if you had a light grip . . . a . . . vibration would begin to wobble where basically the handlebars start turning left and right at a . . . fairly decent frequency." (Rector Dep., at 21-22.) Mr. Rector complained to his Honda dealership but the suggestion to tighten the ball bearings did not provide a lasting solution. (*Id.* at 33-36.)

Clarence Alvord's 2005 GL1800 started exhibiting a vibration at speeds of 35 to 40 mph after he had put only 2,000 miles on the motorcycle. Mr. Alvord contacted several Honda dealers as well as American Honda, but no one would help him fix the problem. (Ex. 30 to Pl. Mem.) He has not replaced the ball bearings and the wobble persists. (Alvord Dep., at 31.)

Henry Seppi noticed a severe wobble on his 2004 GL1800 after riding it approximately 5,000 to 10,000 miles. He contacted Honda's customer service department to report the problem, but a representative told him that the "slight oscillation" is "a normal trait to the unit." (Ex. 32 to Pl. Mem.) When Mr. Seppi replaced the ball bearing with a tapered roller bearing, he experienced an 80 percent decrease in the wobble, but he "still feel[s] that there is a wobble in the front end." (Seppi Dep., at 75.)

Kevin Garthe's 2005 GL1800 started to exhibit a wobble within months of purchase. Mr. Garthe explains that "the handlebars mov[e] from side to side perpendicular to the travel motion," something he never experienced in thousands of hours riding motorcycles. (Garthe Dep., at 5-6, 14-15, 19-20, 26-27.) Mr. Garthe contacted his Honda dealer but was told the wobble was "not really a problem." (*Id.* at 30-32.)

Plaintiffs have submitted declarations from 49 putative class members with similar stories. Each purchased a GL1800 between 2001 and 2008 and experienced a wobble at speeds between 35 and 45 mph. Several declarants replaced the ball bearings with tapered roller bearings, which fixed the problem.

**C.     Plaintiffs' Proposed Classes**

Plaintiffs seek to certify two classes of Gold Wing GL1800 motorcycle owners. Class I covers individuals with breach of express warranty claims, and Class II covers individuals with claims for breach of an implied warranty of merchantability. The two Classes are defined as follows:

Class I

All persons and entities residing in the United States who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., for model years 2001 up to and including the present.

Class II

All persons and entities residing in Alaska, Arkansas, Colorado, Delaware, Washington, D.C., Hawaii, Indiana, Louisiana, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming, who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., for model years 2001 up to and including the present.

In the event the court finds either of these classes inappropriate, Plaintiffs propose two alternative classes limited to the states in which the named Plaintiffs reside. Alternative Class I covers individuals with breach of express warranty claims, and Alternative Class II covers individuals with claims for breach of an implied warranty of merchantability. Plaintiffs define these alternative classes as follows:

<u>Alternative Class I</u>

All persons and entities residing in Delaware, Florida, Illinois, Indiana, Kansas, Louisiana, and Texas, who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., for model years 2001 up to and including the present.

<u>Alternative Class II</u>

All persons and entities residing in Delaware, Indiana, Louisiana, and Texas, who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., for model years 2001 up to and including the present.

Plaintiffs claim that Class I includes over 89,000 purchasers nationwide. Class II consists of more than 13,000 purchasers in 30 states that do not require privity of contract in order to maintain a cause of action for breach of implied warranty. Alternative Class I includes at least 23,243 GL1800 owners who live in the same states as the named Plaintiffs. Alternative Class II consists of at least 11,629 GL1800 owners in four of Plaintiffs' states of residence that do not require privity of contract to maintain an action for breach of implied warranty. Honda objects to certification of any class in this case.

**DISCUSSION**

A court has broad discretion to resolve whether certifying a class is proper under Federal Rule of Civil Procedure 23. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). In making this determination, the court need not accept all of the allegations in the complaint as true. Rather, the court should "make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 594 (N.D. Ill. 2009). Plaintiffs bear the burden of demonstrating that their case meets all of the requirements of Rule 23. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).

To certify a class, the court must find that "each requirement of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) is satisfied as well as one subsection of Rule 23(b)." *Harper v. Sheriff of Cook County*, 581 F.3d 511, 513 (7th Cir. 2009). In this case, Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3); *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008).

Honda does not dispute that Plaintiffs satisfy the requirements of numerosity and typicality, and addresses the issue of commonality only in connection with Rule 23(b). Honda does argue that Plaintiffs' proposed class definitions are inadequate, and that Plaintiffs are not adequate class representatives. Honda also objects that individual questions of fact and law predominate over common questions, and that the class action is not superior to other methods of resolving Plaintiffs' claims. The court addresses each argument in turn.

## I.     Class Definitions

Though it is not specifically mentioned in Rule 23, courts have found that "[t]he class description must be sufficiently definite to permit ascertainment of class members, and 'the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf.'" *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (quoting *Guillory v. American Tobacco Co.*, No. 97 C 8641, 2001 WL 290603, at *2 (N.D. Ill. Mar. 20, 2001)). Aside from differing geographic restrictions, all of the proposed class definitions in this case encompass any individual who purchased a new or used GL1800 during the relevant time period. Honda argues that these definitions are over-inclusive because they cover putative members with no grievances or standing to sue.

In support of this position, Honda directs the court to *Oshana v. Coca-Cola Bottling Co.*, in which the plaintiff sought to certify a class of individuals who purchased a fountain Diet Coke in Illinois from March 12, 1999, forward. 472 F.3d at 509. The plaintiff alleged that the defendant violated the Illinois Consumer Fraud Act ("ICFA") by leading consumers to believe that all forms of Diet Coke would be sweetened with aspartame, when in fact fountain Diet Coke continued to use saccharin. *Id.* The Seventh Circuit agreed with the district court's conclusion that the proposed class was too indefinite to warrant class certification. The court noted that the class "could include millions who were not deceived and thus have no grievance under the ICFA." *Id.* at 514. Some people, for example, "may have bought fountain Diet Coke *because* it contained saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin." *Id.* (emphasis in original).

Honda claims that, as in *Oshana*, some GL1800 purchasers may not have experienced an excessive wobble, which defeats their standing to sue. (Def. Resp., at 17-18.) Mr. Seppi, for example, testified to knowing Gold Wing GL1800 owners who have ridden their bikes for years without a wobble. (Seppi Dep., at 59.) Mr. Garthe reported that he traded motorcycles with nine other GL1800 owners during a road trip, and that he did not feel the same degree of wobble in those bikes as he felt while riding his own. (Garthe Dep., at 8, 85.) And Mr. Alvord testified that a friend's GL1800 rode "differently than" his, implying that it did not have any, or the same type of wobble. (Alvord Dep., at 21-22.)

The problem with Honda's analysis, Plaintiffs argue, is that it presumes that the alleged manufacturing defect depends on each rider's individual experience and perception of wobble. Under Honda's theory, a particular GL1800 motorcycle is only defective if the rider complains of "excessive" wobble. (Def. Resp., at 17.) Plaintiffs' actual theory, they say, is that all GL1800 motorcycles utilize ball bearings that fail to adequately dampen naturally-occurring wobble, and that this design defect exists regardless of individual experience.

Plaintiffs' position is somewhat counterintuitive. Mr. Ezra's wobble decay standard, which forms the basis of Plaintiffs' theory of defect, purports to identify the point at which "the rider neither reacts to nor is frightened by the oscillations." (Pl. Mem., at 6.) That is, Mr. Ezra posits that the motorcycle must itself dampen oscillations consistent with the wobble decay standard in order to "become unperceivable before the rider becomes aware of it, can react to it, or be distracted by it." (*Id.* at 7.) If a rider never perceives, or feels the need to react to, oscillations in his or her GL1800, it is not clear how the motorcycle can be deemed defective. Yet Mr. Ezra opines that it is, and that the defect remains even if 98% of GL1800 owners are "satisfied" with their motorcycles. (Ezra Dep., at 31.) Accepting Mr. Ezra's position as true, what damages have all of those satisfied GL1800 owners suffered?

Regardless, it is not necessary at this point in the proceedings to determine which class members have actually suffered damages. As the Seventh Circuit recently explained, "a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification." *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009). A contrary finding, the court said, would "put[] the cart before the horse" and "would vitiate the economies of class action procedure; in effect the trial would precede the certification." *Id.* at 676.

In reaching this conclusion, the *Kohen* court distinguished cases such as *Oshana* in which the proposed class "contain[ed] a great many persons who have suffered no injury at the hands of the defendant." *Id.* at 677. In the court's view, "[w]hen the potential liability created by a lawsuit is very great, even though the probability that the plaintiff will succeed in establishing liability is slight, the defendant will be under pressure to settle rather than to bet the company, even if the

betting odds are good." *Id.* at 678. The plaintiffs in *Kohen* did not "wildly" overstate the number of parties who could demonstrate injury, and the court affirmed class certification. *Id.* at 679.

In this case, there is no dispute that the named Plaintiffs claim to have suffered damages from the inadequately dampened wobble, which is enough to satisfy the standing requirement for purposes of class certification. *Id.* at 676. *See also Baxter v. Kawasaki Motors Corp.*, 259 F.R.D. 336, 342 (N.D. Ill. 2009) (named plaintiff had standing to sue where he "purchased a motorcycle with the type of odometer at issue.") In addition, the court cannot say at this stage of the proceedings that a majority of GL1800 owners have suffered no injury. In fact, a company called All Balls Racing Products has sold more than 11,000 kits that are marketed as "[t]ak[ing] the shimmy out of Gold Wing GL1800 front wheels." (Pl. Expert Resp., at 11.) On these facts, the court is satisfied that the class definition is adequate.

Honda notes, however, that the proposed classes include individuals whose claims are time-barred. (Def. Resp., at 19.) Defendants observe that in Illinois, a plaintiff alleging breach of warranty must file suit within four years of receiving the product or discovering the breach, whichever is later. 810 ILCS 5/2-725; *Evans ex rel. Husted v. General Motors Corp.*, 314 Ill. App. 3d 609, 614, 732 N.E.2d 79, 83-84 (2d Dist. 2000). Plaintiffs filed this lawsuit in November 2006, so only those putative class members who purchased their GL1800s after November 2002, or discovered the excessive wobble after that date, have timely claims. Yet two of the proposed classes include Illinois purchasers who bought a GL1800, or discovered a wobble, before November 2002. (Def. Resp., at 19.)

As noted, "[t]he definition of a class should not be so broad so as to include individuals who are without standing to maintain the action on their own behalf." *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999). In the court's view, however, the statute of limitations issue is more properly addressed in connection with an analysis of predominance under Rule 23(b)(3). The court therefore turns to the merits of Plaintiffs' class certification motion.

## II.     Rule 23(a)

### A.     Numerosity, Commonality, Typicality

As noted, Honda does not dispute that Plaintiffs satisfy the numerosity and typicality requirements of Rule 23(a)(1) and (a)(3).  Honda does dispute the existence of commonality under Rule 23(a)(2), but addresses the issue only in connection with Rule 23(b)(3).  (Def. Resp., at 22 n.42.)  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997) ("Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.")  In any event, the court has an independent duty under Rule 23(c) "to determine by order that the requirements of Rule 23(a) are met regardless of the defendant's admissions."  *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003).

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  *See Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000).  There is no "magic number" for numerosity, but "joinder is considered impractical when a class numbers at least 40 members."  *Armes v. Shanta Enterprise, Inc.*, No. 07 C 5766, 2009 WL 2020781, at *2 (N.D. Ill. July 8, 2009).  Each of the proposed classes has many thousands of putative members: 89,000 in Class I; 13,000 in Class II; 23,243 in Alternative Class I; and 11,629 in Alternative Class II.  This readily satisfies the numerosity requirement.[2]

Commonality exists under Rule 23(a)(2) "where the claims of individual class members arise from a 'common nucleus of operative fact' such that resolution of common questions affect all or substantially all of the class members.'"  *Pezl v. Amore Mio, Inc.*, 259 F.R.D. 344, 346-47 (N.D. Ill. 2009) (quoting *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)).  Plaintiffs have identified the following common questions:

---

[2]     Even with the geographic and other limitations implemented below, the court remains satisfied that the numerosity requirement is met.

(1)    Whether an express warranty with respect to the GL1800 motorcycles exists;

(2)    Whether the GL1800 manufactured and distributed by Defendants has a defective bearing in its steering assembly;

(3)    Whether Defendants breached express warranties; and

(4)    Whether Defendants breached implied warranties.

(Pl. Mem., at 17.)  The court finds that this suffices to show commonality.  *See, e.g., Barden v. Hurd Millwork Co.*, 249 F.R.D. 316, 319 (E.D. Wis. 2008) ("[C]lass members purchased similar products and received the same standard warranty, thus, there are common questions of law and fact.")

The claims of the representative parties are typical for purposes of Rule 23(a)(3) if they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [their] claims are based on the same legal theory.'" *Pezl*, 259 F.R.D. at 347 (quoting *Oshana*, 472 F.3d at 514).  The Seventh Circuit has explained that "[a]lthough [t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members, the requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large."  *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (internal quotations omitted).  Here, Plaintiffs all purchased GL1800 motorcycles with the allegedly defective ball bearings; all of their motorcycles exhibited wobble; all received the same written warranty; and all sought coverage under that warranty.  Plaintiffs' claims are typical of the class for purposes of Rule 23(a)(3).

### B.    Adequacy of Representation

Honda does challenge Plaintiffs' claim that they will adequately represent a class in this case.  To satisfy Rule 23(a)(4), Plaintiffs must show that (1) their counsel is skilled and experienced enough to represent the class effectively; and (2) Plaintiffs themselves are able to protect the

interests of all class members. *Haynes v. Dart*, No. 08 C 4834, 2009 WL 2355393, at *8 (N.D. Ill. July 29, 2009). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (internal quotations omitted). *See also Baxter*, 259 F.R.D. at 342.

Honda contends that there is a conflict among class members in this case because some GL1800s may exhibit wobble due to something other than the round ball bearings. If, for example, a motorcycle wobbles because of a problem with the tires, then changing the bearings will not fix the problem. Yet the owner of that motorcycle would be subsumed within the class and, thus, barred from bringing suit for the tire issue. (Def. Resp., at 23 (citing *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984)) ("Basic principles of res judicata . . . and collateral estoppel . . . apply" to class actions, so "[a] judgment in favor of either side is conclusive in a subsequent action between them on any issue actually litigated and determined.")

Honda's argument misses the mark. Plaintiffs do not allege that all wobbles are caused by the ball bearings and nothing else. Rather, Plaintiffs claim that

> when *all other* causes of wobble are accounted for, *i.e.*, when the motorcycle is put into factory condition (*e.g.*, it has new tires, is inspected and found to be in good mechanical condition and all parts are installed and adjusted according to Honda's factory specifications), the GL1800 *still* fails to adequately dampen wobble, *until* the ball bearings are replaced with tapered roller bearings.

(Pl. Reply, at 8-9) (emphasis in original). To the extent this lawsuit seeks to recover only for the defective ball bearings, which come standard on all GL1800s, Plaintiffs do not have claims that are antagonistic to the putative class members. They also have "sufficient interest in the outcome [of the case] to ensure vigorous advocacy." *Baxter*, 259 F.R.D. at 342 (quoting *Lifanda v. Elmhurst Dodge*, No. 99 C 5830, 2001 WL 755189, at *3 (N.D. Ill. July 2, 2001)). Thus, Plaintiffs have demonstrated that they will adequately represent a class in this case.

**III.  Rule 23(b)(3)**

Plaintiffs seek class certification under Rule 23(b)(3), which requires that "common questions of law and fact . . . predominate over questions affecting individual members, and the class-action device [is] superior to other methods of adjudicating the controversy." *Andrews*, 545 F.3d at 577.  In determining whether an action is proper under Rule 23(b)(3), courts consider the following criteria:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Silversman v. Motorola, Inc.*, 259 F.R.D. 163, 168 (N.D. Ill. 2009); *Amchem Prods.*, 521 U.S. at 615-16 (1997).  Honda insists that Plaintiffs satisfy neither the predominance nor the superiority requirement in this case.

**A.  Predominance**

The predominance requirement of Rule 23(b)(3) is more demanding than Rule 23(a)'s commonality requirement.  *Amchem Prods.*, 521 U.S. at 623-24.  It "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Randolph v. Crown Asset Mgmt., LLC*, 254 F.R.D. 513, 519 (N.D. Ill. 2008) (quoting *Hyderi v. Washington Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006)).  Where individual issues predominate, class certification is "usually not a superior method for resolving the controversy, since management of such issues by a court will not be efficient." *Id.*

Plaintiffs rely on Mr. Ezra's wobble decay standard to demonstrate that their claims are capable of resolution on a class-wide basis.  Specifically, Plaintiffs argue that common issues predominate here because "this case involves *one* common defect in *one* model of *one*

manufacturer's motorcycle each of which is covered under the *same* written warranty." (Pl. Mem., at 26 (emphasis in original).) That common defect, Plaintiffs say, is the use of ball bearings in the steering assembly that fails to adequately dampen naturally-occurring wobble.

### 1. *Daubert* Analysis

Honda has moved to strike Mr. Ezra's report pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), arguing that the wobble decay standard is itself unreliable, as is its application to this case. In *Daubert*, the Supreme Court held that "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). The district court "must act as the gatekeeper" and determine reliability in light of "the proposed expert's full range of experience and training, as well as the methodology used to arrive at a particular conclusion." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).

### a. Timing

Plaintiffs insist that they need not survive a full *Daubert* analysis at this stage of the proceedings, particularly because the court bifurcated discovery as to class issues and the merits. In support of this position, Plaintiffs rely largely on cases from other jurisdictions, none of which helps their cause. In *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008), for example, the Third Circuit noted generally that "Plaintiffs' burden at the class certification stage is not to prove the element of [their claim], . . . [but to] demonstrate that the element of [their claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311-12. The parties agreed, however, that "a district court may properly consider expert opinion with respect to Rule 23 requirements at the class certification stage," and the court confirmed that opinion testimony must be "rigorous[ly] analy[zed] and "should not be uncritically

accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason."  *Id.* at 322, 323.

A New York District Court did recently opine that at the class certification stage, "this Court's *Daubert* inquiry is limited to whether or not the [expert] reports are admissible to establish the requirements of Rule 23."  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009). The Second Circuit has rejected the argument, however, that "an expert's report will sustain a plaintiff's burden so long as it is not 'fatally flawed.'"  *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).  *See also Rhodes v. E.I. du Pont de Nemours & Co.*, No. 06-cv-00530, 2008 WL 2400944, at *10 (S.D. W. Va. June 11, 2008) ("Failure to make [a *Daubert*] inquiry prior to certification would result in this court's failure to conduct the 'rigorous analysis' required by the Supreme Court.")  In any event, none of these cases is controlling here.

Plaintiffs urge the court to follow *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009), in which the plaintiff sought class certification based upon the expert opinion of Robert Biggerstaff.  *Id.* at 138.  The defendants argued that Biggerstaff's report failed to undertake any analysis of data and was deficient under Federal Rule of Evidence 702 ("Rule 702"). The court disagreed, stating that:

> Biggerstaff interpreted and explained the data on the disk . . ., based upon his own knowledge of computer-based fax programs.  He opined that some of the files were consistent with fax transmission logs created by the HylaFAX program.  He opined that the error-free entries indicating that a one page fax had been sent demonstrated that the fax attempt had been successful.  These opinions reflect the application of his expertise to the data provided.  That is enough to render the opinion sufficiently reliable and thus admissible for the purpose of the motion for class certification.

*Id.* at 139.

Plaintiffs insist that Mr. Ezra's analysis is equally compelling.  Perhaps, but this says nothing about the proper timing of a *Daubert* inquiry.  Plaintiffs also claim that the *CE Design Ltd.* court did not in fact consider any *Daubert* arguments, citing a Minute Order in which the court struck the

plaintiff's *Daubert* motion. (*CE Design Ltd.*, No. 07 C 5456, Minute Order of June 26, 2009, Doc. 144.) A careful reading of that Minute Order, however, reveals that the court simply refused to accept both a response in opposition to the plaintiff's motion for class certification and a separate motion to bar the plaintiff's expert. Rather, the defendants had to submit one memorandum of reasonable length that incorporated "all their arguments pertinent to the class certification issue." (*Id.*)

Moreover, courts in this jurisdiction have indeed engaged in "full-blown" *Daubert* analyses at the class certification stage. In *Reed v. Advocate Health Care*, No. 06 C 3337, 2009 WL 3146999 (N.D. Ill. Sept. 28, 2009), the plaintiffs sought to certify a class of registered nurses and relied on an expert's theory that the putative class members suffered a common injury and damages in order to demonstrate that common issues predominated in the case. *Id.* at *1, 6. The court engaged in a detailed assessment of the expert's analysis, and determined that he "has not applied econometric principles and methods reliably to the facts of this case." *Id.* at *21. In the court's view, the report did not pass muster under *Daubert* or substantively. *Id.* In reaching this conclusion, the court expressly disagreed with the plaintiffs' contention that a full *Daubert* analysis was inappropriate at the class certification stage of the case. *Id.* at *21 n.20. *See also Srail v. Village of Lisle*, 249 F.R.D. 544, 557, 560 (N.D. Ill. 2008) (conducting *Daubert* analysis at class certification stage, noting the Seventh Circuit's warning that "courts should not allow plaintiffs to obtain class certification 'just by hiring a competent expert.'")

To the extent most of Plaintiffs' predominance arguments rest upon the theories advanced by Mr. Ezra, the court finds it proper to address Honda's *Daubert* concerns. Contrary to Plaintiffs' assertion, there is no reason to delay this analysis due to the bifurcated discovery. Honda challenges Mr. Ezra's opinion on two grounds: (1) his wobble decay "standard" is not truly an engineering standard; and (2) his testing of a single used vehicle is inadequate. Neither challenge

turns on evidence in Honda's possession that may be produced during merits discovery. The court

thus considers Honda's substantive objections.

### b. Standard of Review

Expert testimony is admissible under Rule 702 and *Daubert* "when the testimony is reliable

and would assist the trier of fact to understand the evidence or determine a fact at issue in a case."

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). To be reliable, an expert's

opinion must be "well-grounded in methods and procedures of science." *Winters v. Fru-Con Inc.*,

498 F.3d 734, 742 (7th Cir. 2007). In *Daubert*, the Supreme Court set forth a non-exclusive list of

factors to aid judges in determining whether an expert opinion is "grounded in reliable scientific

methodology":

> (1) whether the proffered theory can be and has been tested; (2) whether the theory
> has been subjected to peer review; (3) whether the theory has been evaluated in
> light of potential rates of error; and (4) whether the theory has been accepted in the
> relevant scientific community.

*Winters*, 498 F.3d at 742 (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir.

2001)). The Advisory Committee Notes to Rule 702 provide additional benchmarks for testing

expert reliability:

> (5) whether maintenance standards and controls exist; (6) whether the testimony
> relates to matters growing naturally and directly out of research they have
> conducted independent of the litigation, or developed expressly for the purposes of
> testifying; (7) whether the expert has unjustifiably extrapolated from an accepted
> premise to an unfounded conclusion; (8) whether the expert has adequately
> accounted for obvious alternative explanations; (9) whether the expert is being as
> careful as he would be in his regular professional work outside his paid litigation
> consulting; and (10) whether the field of expertise claimed by the expert is known
> to reach reliable results for the type of opinion the expert would give.

*Fuesting v. Zimmer, Inc.*, 594 F. Supp. 2d 1043, 1046 (C.D. Ill. 2009). "[T]he law grants the district

court great discretion regarding the manner in which it conducts [a *Daubert*] evaluation." *Lewis*, 561

F.3d at 704. In this case, Plaintiffs bear the burden of demonstrating that Mr. Ezra's testimony

would satisfy the necessary requirements. *Id.* at 705.

### c.    Mr. Ezra's "Standard"

Honda argues that Mr. Ezra's wobble decay standard is unreliable because it is not supported by empirical testing.  An Arizona district Court recently reached that exact conclusion in *Gonzales v. Harley-Davidson Motor Co. Group, Inc.*, No. CV-04-0023-PHX-NVW, *slip op.* (D. Ariz. July 26, 2005).  The plaintiff in *Gonzales* lost control of his 2000 Harley-Davidson Road King FLHT platform touring motorcycle and suffered an accident.  He claimed that right before the crash, he "encountered a perturbation of his motorcycle at or near 70 miles per hour" due to a design defect. *Id.* at 1-2.  The plaintiff hired Mr. Ezra as an expert, and the defendant sought to exclude his report under *Daubert*.  The issue in that case was whether the motorcycle adequately dampened "weave," which is "the oscillation of the motorcycle frame and rear wheel assembly about the steering axis."[3] *Id.* at 2.

As in this case, Mr. Ezra proposed that weave should dampen to an amplitude of 37% of the initial peak in one-half to three-quarters of a second, a figure he derived from generally accepted human reaction times.  *Id.* at 3.  Mr. Ezra tested various Harley-Davidson models and concluded that they did not dampen at the 37% standard.  The court concluded that Mr. Ezra's methodology was not reliable, and that the 37% standard represented "Ezra's subjective preference."  *Id.* at 6.  In reaching this conclusion, the court explained:

> Ezra has done no empirical testing to substantiate his measure of safety. . . . [H]e offers no quantification of how much of the standard is extra safety and how much is minimal safety. . . . [E]ven passing over the lack of empirical testing, his proposed standard of decay to 37% of the initial amplitude of the weave in one-half to three-quarters of a second is not shown to be anything more than a subjective preference for an amount of extra safety, rather than an identification of the limit of safety itself.

*Id.* at 7.

---

[3]    "Weave" and "wobble" both relate to oscillations occurring in a two-wheeled vehicle; weave, however, originates in the rear of the vehicle while wobble originates in the front.

The court acknowledged that Mr. Ezra's standard had been published in the *Journal of the National Academy of Forensic Engineers*, a peer-reviewed journal. The court also noted, however, that the article was designed not to report on the validity of a hypothesis but, rather, to "describe a method others could use for litigation." *Id.* at 8, 12. Indeed, the article purported to "suggest[] methods of evaluation of single vehicle motorcycle crashes where weave or wobble mode instability is claimed." *Id.* at 8. The court thus "c[ould] not say with confidence that the peer review process for Ezra's article was done with appropriate rigor." *Id.*

Finally, the court expressed concern that Mr. Ezra developed the weave decay standard for a prior lawsuit. *Id.* In that regard, the court noted the Ninth Circuit's admonition that courts should consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

Honda argues that these same shortcomings plague Mr. Ezra's report in this case. For example, Mr. Ezra's wobble decay standard is purportedly grounded in a rider's reaction to wobble, yet he has never conducted any rider confidence studies to determine the point at which riders actually perceive wobble. Nor has he performed tests to establish the minimal amplitude required for a rider to detect an oscillation. Significantly, however, it is arguably the time required for oscillations to decay below that minimal amplitude that is relevant, rather than just the damping ratio. In other words, "[w]hile it very well may take a rider three-quarters of a second to react to the experience of a wobble, this says nothing about how rapidly a motorcycle must damp out a wobble so that a rider will not [notice] it in the first instance." (Def. Expert Resp., at 8.) Along the same lines, Mr. Ezra has not conducted any human factors testing to confirm that riders will in fact react to oscillations that do not dampen at a rate of 37%.

Plaintiffs suggest that Mr. Ezra did not need to conduct rider confidence studies because Honda's own records reflect that hundreds of customers complained about wobble. (Pl. Expert Resp., at 24.) It seems somewhat disingenuous for Plaintiffs to argue that Mr. Ezra did not need empirical support for his 2004 article because of documents Honda has produced in 2009. In any event, Mr. Ezra has disclaimed any reliance on those materials in formulating his opinion. (Ezra Dep., at 30.)

Plaintiffs also claim that sales of tapered bearings from a company called All Balls Racing Products demonstrate a lack of rider confidence. Specifically, All Balls Racing Products has sold more than 11,000 kits that are marketed as "[t]ak[ing] the shimmy out of Gold Wing GL1800 front wheels." (Pl. Expert Resp., at 11.) This does suggest a lack of rider confidence, but it still does not establish the minimal amplitude of oscillations required for these same riders to notice the wobble, or that the wobble must decay at a rate of 37%. Plaintiffs assert generally that Mr. Ezra's standard "will achieve a higher level of safety" but, Mr. Ezra has not verified whether a lesser or greater percentage of decay would also provide an appropriate margin of safety. (Pl. Expert Resp., at 23.)

Nor does the court find much significance in the fact that Honda's expert, Dr. David H. Weir, agrees that wobble should be "well damped," and that a damping ratio of 0.48 shows "relatively well damped wobble." (Pl. Expert Resp., at 8.) Plaintiffs note that "[a] damping ratio of 0.48 mathematically converts to a decay rate constant of 0.041 seconds [which] is much faster than the 0.5 to 0.75 seconds called for by Mr. Ezra's Decay Rate Standard." (*Id.*) Plaintiffs cite to a 1979 article in which Dr. Weir reported the results of a computer simulation of a small to medium size motorcycle. The purpose of the article, according to Dr. Weir, was to "show how one might model the dynamic behavior of a motorcycle." (Ezra Decl. ¶ 3; Def. Expert Reply, at 7.) Regardless, Dr. Weir's assertion that a damping ratio of 0.48 is relatively well damped in no way refutes a claim that a different ratio is also well damped; Dr. Weir was not addressing that issue in his article.

Plaintiffs dispute that there are any concerns here regarding the fact that Mr. Ezra developed his wobble decay standard for a prior lawsuit, emphasizing that Mr. Ezra published his standard long before Plaintiffs filed this case.  (*Id.* at 24-25.)  The problem articulated by the *Gonzales* court remains, however.  Mr. Ezra's purpose in developing the standard was to assist with a lawsuit and was not conceived through the logical flow of independent research.  The court also agrees with the *Gonzales* court's hesitation in accepting Mr. Ezra's article as adequately peer-reviewed.  The article itself was certainly reviewed, but it is not clear that Mr. Ezra's underlying hypothesis regarding wobble decay was tested for accuracy.  Publications in the *Journal of the National Academy of Forensic Engineers* are subject only to "oral critique," and Mr. Ezra's stated purpose in drafting the article was "not . . . to discuss castor oscillations and the motorcycle design parameters which control castor stability on motorcycles in depth, but rather to discuss methods of analyzing a given motorcycle's castor stability and relating this to specific crash scenarios where castor instability in the motorcycle is alleged."  (Ezra, *Forensic Engineering Investigation of Motorcycle Instability Induced Crashes*, at iv, 71 (June 2004).)

Added to these concerns is the fact that "Ezra's standard is also not generally accepted in the scientific community."  To the contrary, "no governmental body or industry group has proposed any standard decay rate for a reasonably safe motorcycle . . . because . . . [i]t is very difficult to establish an absolute standard of . . . w[obble] decay times."  *Gonzales*, at 7.  *See Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir. 1993) ("[w]idespread acceptance by the scientific community is relevant in considering reliability," and where "[a] known technique . . . has gained only a minimal following [it] may be viewed with some skepticism.")  Plaintiffs argue that the 37% oscillation decay standard is used "world-wide," citing to a 1980 article by Dr. G.E. Roe and Dr. T.E. Thorpe called *Improvements to the Stability, Handling and Braking of High-Performance Motorcycles* ("Roe & Thorpe").  (Pl. Expert Resp., at 7 and n.8.)  Again, however, without knowing the minimal amplitude of oscillations at which riders perceive wobble, the 37% decay rate arguably

remains somewhat speculative. Moreover, Roe and Thorpe suggest in their article that wobble (*i.e.*, "flutter") should decay in less than one second, not the 3/4 of a second propounded by Mr. Ezra. (Roe & Thorpe, Ex. 9 to Pl. Expert Resp., at 574.)

There is also some question as to whether Mr. Ezra used a reliable test sample to conclude that the entire fleet of GL1800s is defective. *See Allgood v. General Motors Corp.*, No. 1:02-cv-1077-DFH-TAB, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) ("[S]ample choice . . . is an issue of methodology [and] must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured.") Dr. Weir opines that Mr. Ezra should have tested at least 14 GL1800s, and in no event fewer than six GL1800s, to obtain statistically significant results. (Def. Expert Reply, at 12.) Mr. Ezra counters that he conducted his tests on a GL1800 that was put into factory condition, making it "essentially identical to all other GL1800s." (Pl. Sur-Reply, at 5.)

Viewing all of the arguments together, the court has definite reservations about the reliability of Mr. Ezra's wobble decay standard. Nevertheless, the court declines to exclude the report in its entirety at this early stage of the proceedings.

### 2. Questions of Fact and Law

Anticipating this result, Honda identifies a multitude of other reasons this case is not suited to class treatment. The Seventh Circuit has repeatedly cautioned that nationwide classes in breach of warranty actions "pose[] serious problems about choice of law, the manageability of the suit, and thus the propriety of class certification." *Szabo*, 249 F.3d at 674. As a result, "few warranty cases ever have been certified as class actions – let alone as nationwide classes, with the additional choice-of-law problems that complicate such a venture." *Id. See also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) (state law "differences have led us to hold that other warranty . . . suits may not proceed as nationwide classes."); *In re General Motors Corp. Dex-Cool Prods. Liability Litig.*, 241 F.R.D. 305, 324 (S.D. Ill. 2007) ("*Dex-Cool*") ("In view of the significant

variations with respect to the law of warranty among the states in the proposed class, the Court's path is clear. The Seventh Circuit Court of Appeals has warned repeatedly in recent years against the certification of unwieldy multistate classes, holding that the difficulties inherent in applying the laws of numerous states to the class claims defeat both predominance and manageability.")

Plaintiffs distinguish these cases by stressing that they involved multiple product models, whereas this case involves only one motorcycle model – the GL1800. Honda maintains, however, that the problem of assessing multiple individual questions remains. Specifically, Honda claims that individual inquiries predominate with respect to (1) state law differences in reliance and pre-litigation notice requirements; (2) statutes of limitations; (3) choice of law; (4) the definition and scope of merchantability; (5) damages; (6) defect manifestation; and (7) cause of wobble. As discussed below, Honda's concerns can all be addressed by implementing appropriate limitations.

### a.        Reliance and Pre-Litigation Notice

The parties agree that state laws vary when it comes to the issues of reliance and pre-litigation notice. Some jurisdictions require that a plaintiff prove that he relied upon a warranty in making his purchase in order to recover for a breach. Other jurisdictions require that a plaintiff provide the defendant with pre-litigation notice. Honda contends that Plaintiffs cannot demonstrate predominance where, as here, questions of reliance and notice must be addressed on an individual basis. In support of this position, Honda directs the court to *Cole v. General Motors Corp.*, 484 F.3d 717 (5th Cir. 2007), in which the Fifth Circuit stated that "certain jurisdictions' requirement that plaintiffs show reliance as a condition for recovery greatly impacts the predominance inquiry: 'the economies ordinarily associated with the class action device' are defeated where plaintiffs are required to bring forth individual proof of reliance." *Id.* at 727 (quoting *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001)) (in RICO case, certification was improper where "[e]ach member of this putative class must . . . prove reliance upon [the defendant's] fraud in stating it was covered by workers' compensation insurance.") The court also observed that "[g]iven the variations among

the states regarding the notice requirement, plaintiffs failed to adequately analyze the impact of these variations on predominance." *Id.*

Plaintiffs first argue, without citation to competent authority, that reliance should be presumed in this case because it involves a standard written warranty. (Pl. Mem., at 30-31; Pl. Reply, at 24.) The court disagrees. The case of *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), which Plaintiffs cite in a footnote, merely indicates that "no state disregards warranties furnished with consumer products." *Id.* at 1451. And contrary to Plaintiffs' suggestion, the fact that a standard warranty may be part of the "basis of the bargain" in no way demonstrates that a purchaser either did, or did not need to rely on that warranty. *See, e.g., Heisner ex rel. Heisner v. Genzyme Corp.*, No. 08 C 593, 2008 WL 2940811, at *8 n.2 (N.D. Ill. July 25, 2008) (noting that Illinois courts have not been consistent in assessing whether the "basis of the bargain" language in 810 ILCS 5/2-313 requires that the plaintiff actually relied on the warranty). Plaintiffs' presumed reliance argument is rejected.

Plaintiffs next claim that they provided class-wide notice by sending Honda a pre-suit demand letter dated July 27, 2006, as required under the California Legal Remedies Act. (Pl. Mem., at 30 n.29; Pl. Reply, at 27.) The letter accuses Honda of consumer fraud, false and misleading advertising and deceptive practices. (Ex. 42 to Pl. Mem.) Plaintiffs maintain that whether this letter constitutes notice as required by § 2-607 of the Uniform Commercial Code ("UCC") is a question of fact common to all class members. *See, e.g., Greenwich Indus., L.P. v. Leggett & Platt, Inc.*, No. 07 C 6550, 2009 WL 1657441, at *4 (N.D. Ill. June 11, 2009) (quoting *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 686 F. Supp. 1319, 1337 (N.D. Ill. 1988)) ("[T]he timeliness (like the adequacy) of notice is a question of fact normally left to the ultimate factfinder.") Even assuming this is true, Plaintiffs ultimately seek to certify a class of purchasers governed by state law. As the *Cole* court noted, "[s]tate law varies in what constitutes reasonable notice and to

whom notice should be given, and other courts considering the issue in the class certification context have noted that these variations impact predominance." 484 F.3d at 727.

Plaintiffs suggest that state differences in both reliance and pre-litigation notice requirements can be managed by dividing the class into four subclasses of plaintiffs: those residing in (1) states in which reliance and pre-litigation notice are both required; (2) states in which reliance is required but pre-litigation notice is not; (3) states in which reliance is not required but pre-litigation notice is; and (4) states in which neither reliance nor pre-litigation notice is required. (Pl. Mem., at 30.) The plaintiff attempted a similar tactic in *Barden v. Hurd Millwork Co.*, 249 F.R.D. 316 (E.D. Wis. 2008). In seeking to certify a class of individuals who purchased defective glass products in a breach of express warranty case, the plaintiff proposed dividing the class into the same four subclasses suggested by Plaintiffs in this case. *Id.* at 318, 320-21. The court declined to certify a class with respect to the first three subclasses, explaining that a determination of whether each individual class member relied on the warranty and/or provided pre-litigation notice "would appear to require a relatively intensive factual inquiry into each individual case." *Id.* at 321. The court also noted that "[v]ariations in the laws within th[os]e sub-classes would further complicate the matter." *Id.* The court did find, however, that common issues predominated as to the fourth subclass of states that did not require reliance or pre-litigation notice, and certified a class of those plaintiffs. *Id.*

Plaintiffs have identified 24 states that do not require reliance or pre-litigation notice for breach of express warranty claims: Colorado, Delaware, Florida, Hawaii, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Vermont, Virginia, Washington, West Virginia and Wisconsin. The District of Columbia also falls within this category. (Ex. 43 to Pl. Mem, at 10-14.) The court rejects Honda's claim that Oklahoma does require reliance, but agrees that Pennsylvania applies a rebuttable presumption of reliance. (Def. Resp., at 33 (citing *Cole*, 484 F.3d at 726).)

This presumption, if rebutted, would lead to "a myriad of issues of individual reliance." *Dex-Cool*, 241 F.R.D. at 321.

The court finds that for purposes of Class I, individual issues of reliance and pre-litigation notice do not predominate with respect to plaintiffs living in Colorado, Delaware, Florida, Hawaii, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Vermont, Virginia, Washington, West Virginia, Wisconsin and the District of Columbia. Though the court will be called upon to address the laws of multiple jurisdictions, the laws are similar enough that the case will be manageable. *Cf. Calkins v. Fidelity Bond and Mortg. Co.*, No. 94 C 5971, 1998 WL 719569, at *3 (N.D. Ill. Oct. 8, 1998) ("Application of multiple state laws may bar class certification where the class may not be broken down into manageable subclasses.")

Honda objects that the above subclass for breach of express warranty claims "would not resolve . . . variances in notice requirements in the implied warranty class." (Def. Resp., at 35 n.56.) The court agrees. Plaintiffs have already limited Class II to jurisdictions that do not require privity of contract. Of those, 13 do not require pre-litigation notice: Alaska, Colorado, Delaware, Hawaii, Louisiana, Nebraska, Nevada, New Jersey, Oklahoma, Pennsylvania, South Carolina, West Virginia and the District of Columbia. (Pl. Mem., at 32 n.31.) Individual questions of notice do not predominate with respect to plaintiffs residing in these jurisdictions.

### b.    Statutes of Limitations

Honda argues that individual issues still predominate a breach of warranty claim because putative class members will be subject to different statutes of limitations. Of course, individual issues of compliance with the statute of limitations will not automatically prohibit class certification, as long as "a sufficient constellation of common issues binds class members together." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 486 (N.D. Ill. 2009) (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002)). Plaintiffs argue that 45 of the 50 states, as well as the District of

29

Columbia, have a four-year statute of limitations for breach of warranty claims. The remaining states have statutes of limitations ranging from three to six years. On these facts, Plaintiffs contend, there is actually very little variation and applying the statutes will be easy. (Pl. Reply, at 28-29.)

In addition, Plaintiffs submit that the court can use the date of purchase as the accrual date for all class members in order to address Honda's concerns about determining when individual purchasers discovered, or should have discovered, the defect. Plaintiffs filed this lawsuit against Honda on November 1, 2006, but had another lawsuit pending in the Central District of California from July 24, 2006 to August 10, 2006. Adding these 17 days to the filing date, Plaintiffs effectively filed suit on October 15, 2006. Plaintiffs thus claim that in the 45 states with a four-years statute of limitations, anyone who purchased a GL1800 motorcycle on or after October 15, 2002 is a member of the class. (*Id.*)

The *Baxter* court recently utilized a similar technique. The plaintiff filed suit on November 30, 2007, and the limitations period was two years from discovery of the claim. 259 F.R.D. at 341. In setting November 30, 2005 as the cut-off date for class membership, the court explained:

> The purchase date of a motorcycle likely does not correspond with when a putative plaintiff will have discovered a deficiency with the odometer. Many, if not most, potential class members likely still have not discovered their odometers are inaccurate. However, to avoid any individualized issue as to discovery of a claim and a potential limitations defense, members of the class will be limited to those who purchased their motorcycle November 30, 2005 or later.

*Id. Cf. Parkis v. Arrow Fin. Servs., LLS*, No. 07 C 410, 2008 WL 94798, at *4 (N.D. Ill. Jan. 8, 2008) (in action alleging that the defendants filed suit against the plaintiffs to collect on time-barred debts, the commonality requirement was not satisfied because the court "would have to look into the payment history of each putative class member to determine whether the last payment date or charge-off date was more than five years prior to the filing of the debt-collection suit.")

Of the jurisdictions still at issue following the court's reliance and pre-litigation notice analysis, all but Colorado, Oklahoma, South Carolina and Wisconsin have four-year statutes of limitations.[4]  Colorado's statute of limitations is three years; Oklahoma's is five years; and South Carolina's and Wisconsin's are six years.  The court is satisfied that the parties can easily ascertain the purchase date of every motorcycle using Honda's electronic records.  By limiting class membership to those who purchased a GL1800 motorcycle within the applicable limitations period before October 15, 2006, individual questions will not predominate.

### c.    Choice of Law

Honda next contends that choice of law rules defeat predominance.  It is well-established that in a diversity suit such as this, "the federal court applies the conflicts principles of the state in which it sits."  *Carris v. Marriott Int'l, Inc.*, 466 F.3d 558, 560 (7th Cir. 2006).  Illinois conflicts principles "require the court to select the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties."  *Id.* (citing *Esser v. McIntyre*, 169 Ill. 2d 292, 297-98, 661 N.E.2d 1138, 1141 (1996)).  For contract claims, courts consider (1) the place of contracting; (2) the place of the negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile and nationality of the parties.  *Curran v. Kwon*, 153 F.3d 481, 488 (7th Cir. 1998).  "The burden of proof on the requirement that choice of law and conflict of law issues not present any predominance or manageability issues rests squarely with the plaintiff."  *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 332 (S.D. Ill. 2009).

Honda presents Mr. Garthe as a "prime example" of the need to conduct individualized inquiries into the particular circumstances of each class member.  Mr. Garthe lives in Illinois, but

---

[4]    Florida's statute has no limitations period so Illinois' four-year statute of limitations applies.  *Lantz v. American Honda Motor Co.*, No. 06 C 5932, 2007 WL 1424614, at *10 (N.D. Ill. May 14, 2007).

he purchased his GL1800 in Tennessee. In Honda's view, it is unclear whether Illinois or Tennessee law will govern Mr. Garthe's claims because some factors (location of the motorcycle, Mr. Garthe's domicile) point to Illinois law, while others (place of contracting, place of negotiation of the contract) point to Tennessee law. (Def. Resp., at 31.)

Plaintiffs stress that the court need only follow Illinois' choice of law rules, and suggest that under this analysis, the court will look to the law of each plaintiff's state of residence. (Pl. Reply, at 33-34.) Plaintiffs rely primarily upon *Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618 (Okla. 2003), a breach of warranty case involving minivans with defective air bags. *Id.* at 621. The court stated that where the UCC warranties at issue were not negotiated in the purchase of the new cars, "the relative interest of each buyer's home state in applying its version of the UCC [wa]s more or less equal." *Id.* at 625. *See also In re Bridgestone/Firestone*, 288 F.3d at 1017 (under Indiana choice of law rules, the injury for breach of warranty "is decidedly where the consumer is located.")

The court agrees that "[t]he goal of warranty law is protection rather than regulation, and each state's warranty law is designed to protect consumers within the state." *Barden*, 249 F.R.D. at 320. Each class member's claim thus will be governed by the law of his or her home state. Again, since the law of more than one jurisdiction will apply in this case, the court must consider whether variations in those laws render class action litigation unmanageable. The court has already determined that by excluding states that require reliance and pre-litigation notice for breach of express warranty claims, proposed Class I will not be unmanageable. The court has also limited Class II to 13 jurisdictions that do not require privity of contract or pre-litigation notice to recover for breach of an implied warranty. Plaintiffs, in turn, have submitted a chart showing that the laws of those 13 jurisdictions are very similar and would not create manageability problems. (Ex. 44 to Pl. Mem.) The court is satisfied that with these restrictions, the choice of law issue does not present any predominance or manageability problems.

### d.      Merchantability

As it stands, Class II consists of jurisdictions that do not require privity of contract or pre-litigation notice, which helps to avoid individual issues with respect to claims for breach of the implied warranty of merchantability. These jurisdictions include: Alaska, Colorado, Delaware, Hawaii, Louisiana, Nebraska, Nevada, New Jersey, Oklahoma, Pennsylvania, South Carolina, West Virginia and the District of Columbia. Honda objects that state rules differ in other respects as well, but most of its arguments relate to jurisdictions that are not encompassed within Class II.

Honda claims, for example, that in many states, "'prolonged use of a product raises a presumption of merchantability'" that may be rebutted with individual evidence. (Def. Resp., at 37.) Honda supports this assertion by citing to *Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), where the plaintiffs sought to certify a nationwide class of individuals who purchased vehicles with a defective automatic transmission. *Id.* at 261. Specifically, the plaintiffs alleged that the vehicle suddenly went into reverse after the driver attempted to place the car in park (a phenomenon referred to as "park-to-reverse" movement.") *Id.*

In declining to certify a class for breach of implied warranty of fitness claims, the court noted that "[n]umerous vehicles included in the plaintiffs' proposed classes either experienced park-to-reverse incidents only after many years of use, or have yet to experience such incidents." *Id.* at 273. The court stated that it would thus "need to inquire whether the presumption of merchantability had been established as to each individual owner in those states providing for it, and also, whether the plaintiffs' evidence rebutted the presumption." *Id. See also Cole*, 484 F.3d at 730 (citing *Walsh* for the proposition that "[i]n some jurisdictions, use of a vehicle for a certain period of time without experiencing a defect gives rise to a presumption that the vehicle is merchantable.")

In reaching this conclusion, the court cited to cases and statutes from just four states: Colorado, Iowa, Mississippi and North Carolina. *Id.* Of those, only Colorado remains included in Plaintiffs' Class II. The cited Colorado statute creates, under certain circumstances, a rebuttable

presumption in products liability cases that a product "which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent." Colo. Rev. Stat. § 13-21-403. To the extent Plaintiffs do not seek to recover for negligence under a products liability theory, it is not clear that this statute applies here.

Honda's second concern – that individual issues predominate because state laws differ as to the enforceability of warranty disclaimers – is also overstated. There is no dispute that Honda's written warranty limits the time for merchantability claims to the extent permitted by state law. (Def. Resp., at 37.) By Honda's own admission, however, most states follow UCC § 2-316(2) and permit the modification or exclusion of an implied warranty of merchantability as long as it is in writing and "conspicuous." (*Id.*) Honda emphasizes that state law differences still exist. For example, Massachusetts, Maine, West Virginia and the District of Columbia have complete statutory bans on warranty disclaimers; South Carolina and Washington impose heightened burdens of clarity on the seller; and Connecticut and Vermont allow warranty disclaimers for used, but not new, products. (*Id.* at 38.)

Plaintiffs respond that of the cited jurisdictions, only South Carolina, West Virginia and the District of Columbia are included in Class II. South Carolina's statute of limitations is six years, so the accrual date for breach of warranty claims is October 15, 2000. This predates the date on which Honda first began selling the GL1800, and clearly covers all claims at issue in this case regardless of Honda's disclaimer.[5] (Pl. Reply, at 38 n.38.) The District of Columbia statute covers "household goods," and it is not clear that a motorcycle qualifies. (*Id.* at 38 n.39.) *See, e.g., Potomac Plaza Terraces, Inc. v. QSC Prods., Inc.*, 868 F. Supp. 346, 351 (D.D.C. 1994) (roofing

---

[5] Plaintiffs also note that Comment Three to South Carolina's statute allows disclaimer of the implied warranty of merchantability if the disclaimer mentions merchantability on the face of the warranty – which Honda's does – and is conspicuous. S.C. Code Ann. § 36-2-316(2). Thus, it appears that in this case, application of South Carolina law would actually parallel UCC § 2-316(2).

materials were not "household goods" where they were not "furniture, furnishings and personal effects used . . . in the dwelling.")

As for West Virginia, Plaintiffs suggest that limitations on warranty disclaimers may be preempted by the federal Magnuson-Moss Act, 15 U.S.C. § 2301 *et seq.* In *Asp v. Toshiba Am. Consumer Prods., LLC*, 616 F. Supp. 2d 721 (S.D. Ohio 2008), for example, the court noted that "Section 2308(b) of the Magnuson-Moss Act . . . preempts state law regarding the modification of the implied warranty of merchantability in limited warranties . . . and also permits sellers to limit the duration of the implied warranty of merchantability." *Id.* at 732 n.4. This court gives no opinion as to the validity of this assertion, but notes that there may be a discrepancy in the laws of at most one or two states.

Honda fares no better by arguing that in some states, merchantability depends upon consumer expectations. (Def. Resp., at 28.) Honda supports this proposition by citing to *Robinson v. American Honda Motor Co.*, 551 F.3d 218 (4th Cir. 2009), in which the Fourth Circuit noted that under Maryland law, the definition of merchantability "incorporates trade quality standards and the consumer's reasonable expectations." *Id.* at 225. From there, Honda argues that consumer expectations "depend upon the circumstances, including the condition in which the product was purchased." (Def. Resp., at 28-29.) The problem with this argument, of course, is that Class II does not include Maryland, and Honda has not identified any other jurisdiction that has a similar requirement. *National Inspection & Repairs, Inc. v. George S. May Int'l Co.*, No. 03 C 5529, 2008 WL 4389834, at *1 (N.D. Ill. Sept. 24, 2008) ("[I]t is not this court's job to . . . marshal evidence for represented parties.")

Honda's final argument also falls short. Honda contends that states do not agree as to the proper characterization of a claim for breach of implied warranty. By Honda's assessment, Rhode Island and Tennessee view such claims as "fundamentally contractual"; Arkansas, Colorado, Delaware, Illinois, Michigan and New Hampshire view them as "tortious in essence" or negligence-

based; and Kansas adopts a"flexible approach." (Def. Resp., at 36 (citing cases.)  Honda deems these differences significant in that they "affect[] the availability of the affirmative defenses of contributory negligence, assumption of the risk, and product misuse." (*Id.*)  In a related argument, Honda observes that some states require that a plaintiff prove that the motorcycle was defective at the time it left the seller's or manufacturer's possession.  *See, e.g., McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 552 (5th Cir. 2003) (applying Texas law); *Makuc v. American Honda Motor Co.*, 835 F.2d 389, 392-93 (1st Cir. 1987) (applying Massachusetts law).

Plaintiffs again note that most of Honda's cited cases are excluded from Class II.  Colorado and Delaware are at issue, but Honda has relied solely on cases that involve personal injuries in products liability suits.  *See Camacho v. Honda Motor Co.*, 701 P.2d 628, 629-30 (Colo. Ct. App. 1985); *Nacci v. Volkswagen of America, Inc.*, 325 A.2d 617, 618 (Del. Super. Ct. 1974).  *See also Maiorino v. Weco Prods. Co.*, 45 N.J. 570, 573 (1965) (noting that "most jurisdictions bar plaintiff's recovery [in products liability cases based on breach of an express or implied warranty of fitness] where his misuse or abuse of the product in combination with a defect in the product, brings about his personal injury, or where he continued to use the product with knowledge, actual or constructive, of its defective condition, or where the mishap and consequent injury resulted from failure to follow use directions to which his attention was plainly called.")  Plaintiffs, however, do not advance negligence or products liability theories in this case, nor do they seek to recover for personal injuries.  (Pl. Reply, at 34.)

In sum, the court is satisfied that common issues predominate with respect to Class II as limited in geographical scope.

### e.    Damages

In their complaint, Plaintiffs seek damages "in the amount of monies paid for Gold Wings, the loss of use of the Gold Wings, diminution in value, and/or other consequential or incidental damages." (Cmplt. ¶ 41, Prayer for Relief B.)  Honda argues that "[t]he recovery of such damages

will turn on individualized facts – *e.g.*, the price each class member paid for his or her GL1800, the extent to which he or she has been deprived of the GL1800's use, the extent to which the GL1800 has diminished in value because of the level of wobble it exhibits, and any mitigation undertaken by specific class members." (Def. Resp., at 31.)

In a related argument, Honda claims that individual issues predominate with respect to the enforceability of contractual limitations on damages. Honda recognizes that most states have adopted UCC § 2-719(3), which provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." (Def. Resp., at 37.) Courts, however, have come to differing conclusions regarding the interpretation of the unconscionability requirement. *Compare Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 708 (9th Cir. 1990) (citing *Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309 (9th Cir. 1984)) (under Washington law, exclusion of consequential damages is not enforceable if the limited remedy would cause the contract to fail of its essential purpose), *with Razor v. Hyundai Motor America*, 222 Ill.2d 75, 93, 854 N.E.2d 607, 618 (2006) (a consequential damages disclaimer may be enforced, if not unconscionable, even if the limitation of remedy causes a failure of essential purpose).

Plaintiffs now clarify that the only damages they seek here are the costs to "repair or replace" the ball bearings, which will range between $300 and $500 per motorcycle. (Pl. Reply, at 32 n.28.) Plaintiffs explain that the other forms of damages articulated in the complaint are "vestigial remnants damage theories for other causes of actions formerly contained in Plaintiffs' prior complaint and which are no longer at issue in this case." (*Id.*) Plaintiffs also affirmatively state that they are not seeking any consequential damages. The court accepts Plaintiffs' representations.

Honda remains correct that each GL1800 owner will have to demonstrate individually that he or she suffered damages. The court recognizes, however, that "the need for individual damages determinations does not, in and of itself, require denial of [a] motion for certification." *Arreola*, 546

F.3d at 801. Rather, "district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts." *Id.*

### f. Manifestation of Defect

Honda argues that no such common issues outweigh the damages question here, claiming that the court would need to conduct individual hearings to assess the condition of each class member's motorcycle and determine whether it actually manifests the wobble defect. (Def. Resp., at 24.) Honda relies again on *Cole*, in which the Fifth Circuit noted that "many jurisdictions do not permit the recovery of economic loss in vehicle defect cases where the vehicle has performed satisfactorily and has never manifested the alleged defect." 484 F.3d at 729. The plaintiffs in *Cole* brought a nationwide breach of warranty claim on behalf of individuals who owned or leased a vehicle with defective side impact airbags. *Id.* at 718. The court held that common issues did not predominate in that case in part because "[t]he vast majority of the members of this class never experienced any manifestation of the alleged defect," including the named plaintiffs. *Id.* at 719, 729.

Honda also cites to *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir. 1999), in which the putative class alleged that their vehicles were equipped with defective anti-lock braking systems that caused drivers to misapply the brakes during emergencies. *Id.* at 626. The plaintiffs' brakes, however, functioned satisfactorily and did not exhibit a defect. *Id.* at 628. In upholding dismissal of the complaint, the court explained that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Id.* at 628.

Plaintiffs repeat their position that all GL1800s have a defective ball bearing that fails to adequately dampen wobble, and suggest that this defect manifests itself everytime a rider uses the bike, whether or not the rider actually perceives it. It is far from clear, however, that an entirely unnoticed malfunction can constitute a "manifest" defect as required under state law. *See, e.g., O'Neil v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008), *aff'd*, 574 F.3d 501 (8th Cir. 2009) ("[T]he plaintiff must . . . allege an *actual manifestation* of the defect *that results in some*

*injury* in order to state a cognizable claim for breach of warranty.") (emphasis in original); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998) (class certification was not appropriate under Rule 23(b)(3) because "[p]roving a class-wide defect where the majority of class members have not experienced any problems with the alleged defective product, if possible at all, would be extremely difficult."); *Gable v. Land Rover N. America, Inc.*, No. CV07-0376-AG (RNBx), 2008 WL 4441960, at *1, 5 (C.D. Cal. Sept. 29, 2008) (declining to certify class where the plaintiff failed to show that even a majority of the class members had actually experienced a problem with uneven and premature tire wear due to the vehicle's defective design).

Unlike the plaintiffs in *Cole*, *Briehl*, *O'Neil*, *Chin*, and *Gable*, Plaintiffs here do allege that they have personally experienced the defect, and that thousands of others have as well. Plaintiffs direct the court to *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006), in which the Sixth Circuit upheld certification of a class of van purchasers seeking damages for a defective throttle body assembly, even though it included vehicle owners and lessees who never actually experienced a manifestation of the alleged defect. *Id.* at 550. The court explained that "[t]he class members' claims do not differ based on whether there has been actual accelerator sticking because they all allege that Ford delivered a good that did not conform to Ford's written warranty." *Id.* at 554. The court did note, however, that "[i]f at a subsequent point in the litigation, the district court determines that the express warranty is limited to defects that manifest themselves within the warranty period, the district court may consider at that point whether to modify or decertify the class." *Id.*

In the court's view, *Daffin* is arguably distinguishable from this case in that the plaintiffs there sought to recover for the lost value of the car caused by the presence of the defect. *Id.* at 553 (plaintiff "asserts the same claim for diminution in value of the [vehicle] due to delivery of a non-conforming vehicle.") *See also Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) (rejecting theory that plaintiffs suffered damages "based solely on the 'diminished resale value' of their . . . cars."); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997) ("Plaintiff's

allegation of possible economic loss fails to plead adequately the required damages element for . . . breach of warranty."); *Briehl*, 172 F.3d at 629 ("Plaintiffs' assertion that their ABS-equipped vehicles are defective and that they have suffered a loss in resale value as a result of the defect is insufficient as a matter of law to plead a claim" for breach of warranty absent any defect manifestation). In this case, Plaintiffs have expressly disclaimed any intent to seek damages for the motorcycle's purported reduction in value stemming from the defective ball bearings.

Plaintiffs stress that not all states require defect manifestation. By Plaintiffs' estimation, of the jurisdictions still at issue following the court's earlier analyses, Louisiana, New York, Ohio, Oklahoma, Pennsylvania and South Carolina definitely require defect manifestation. To ensure that common issues predominate, these states will be excluded from the classes. Only three states – Maryland, Massachusetts and Michigan – affirmatively do not require defect manifestation. That leaves 17 states and the District of Columbia where the law is "unclear": Alaska, Colorado, Delaware, Florida, Hawaii, Idaho, Kansas, Missouri, Nebraska, Nevada, New Jersey, North Carolina, Vermont, Virginia, Washington, West Virginia and Wisconsin.

With respect to states in which the law is unclear, the court will be forced to try and predict what the highest courts would conclude about defect manifestation on the facts presented here. *See Abstract & Title Guar. Co. v. Chicago Ins. Co.*, 489 F.3d 808, 811 (7th Cir. 2007) ("[W]hen the highest court in the state has not spoken [on a question of state law] we must attempt to predict how we believe that court would decide.") The court appreciates that "[c]ertification of a class is not proper 'unless all litigants are governed by the same legal rules.'" *Cunningham Charter Corp.*, 258 F.R.D. at 332 (quoting *In re Bridgestone/Firestone*, 288 F.3d at 1015). To the extent that most of these jurisdictions do not even mention defect manifestation, however, it is unlikely that they recognize such a requirement, apart from a showing of damages.

The court will include Alaska, Colorado, Delaware, Florida, Hawaii, Idaho, Kansas, Missouri, Nebraska, Nevada, New Jersey, North Carolina, Vermont, Virginia, Washington, West Virginia,

Wisconsin and the District of Columbia in the classes as appropriate, but reserves the right to exclude one or more upon further showing that there is a defect manifestation requirement.

### g.    Cause of Wobble

Honda finally argues that "[a]n allegation of a class-wide defect does not establish predominance where, as here, alternative causes of the condition are known to exist." (*Id.*)  *See Farrar & Farrar Dairy, Inc. v. Miller-St. Naziant, Inc.*, 254 F.R.D. 68, 73-74 (E.D.N.C. 2008) (where "numerous things" could cause silage bags to fail, "[c]ertification would be an exercise in futility, as the court would need to address the numerous individual causation questions one by one even if named plaintiffs are able to prove that the silage bags are defective.")  Plaintiffs respond that Mr. Ezra controlled for other causes of wobble by putting the GL1800 into factory condition, but that the motorcycle still failed to adequately dampen naturally-occurring wobble.  (Pl. Reply, at 23.)

Accepting Plaintiffs' theory that the ball bearings in every GL1800 are defective, Honda's argument is more properly characterized as an attack on damages.  As noted, one rider may perceive wobble as normal handling, while another rider may perceive it as instability.  (Ezra Dep., at 33.)  And some GL1800 owners may not have experienced a wobble problem at all, much less one stemming from the ball bearings.  Indeed, one GL1800 owner purchased tapered bearings from All Balls Racing Products but found that it did not solve his motorcycle's wobble.  Mr. Ezra stated: "[W]e don't know what the conditions of his motorcycle, what he was looking for in the way of improvement." (Ezra Dep., at 133.)

The court again agrees that each GL1800 owner will have to demonstrate individually that he or she suffered damages, which will include a showing that any wobble is in fact caused by the ball bearings.  There remain substantial common questions, however, including (1) whether the ball bearings in the GL1800 constitute a defect; and if so, (2) whether Honda's failure to replace the ball bearings constitutes a breach of express or implied warranties.  As discussed below, moreover, the court believes that a class action is the superior method of resolving Plaintiffs' claims.

### B.    Superiority

Rule 23(b)(3) requires that a class action be "superior to the available methods for the fair and efficient adjudication of the controversy."  Courts have found that "[a] class action is superior where potential damages may be too insignificant to provide class members with incentive to pursue a claim individually."  *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) (quoting *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 352-53 (N.D. Ill. 2008)).  The amount of damages at stake here is extremely small – $300 to $500 per class member – making this case particularly well-suited for class treatment.

In addition, the court has implemented a variety of other measures to ensure that the class will be manageable.  This includes (1) limiting the classes to those jurisdictions that do not require a showing of reliance, pre-litigation notice, or privity of contract; (2) setting October 15, 2006 as the date by which all statutes of limitations will be measured; and (3) applying the law of each plaintiff's state of residence.  Contrary to Honda's assertion, the laws in the jurisdictions at issue for each class are sufficiently similar to allow the court to instruct a jury and minimize any federalism concerns.  *Cf. Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 746 (7th Cir. 2008) (class action not superior in consumer fraud case where  the plaintiff "wants to litigate in a single federal district court half a million claims wrested from the control of the courts of 29 jurisdictions in which those claims arose," and "[t]he instructions to the jury on the law it is to apply will be an amalgam of the consumer protection laws of the 29 jurisdictions.")

The court remains cognizant of the fact that damages issues must be decided on an individual basis.  If the case proceeds to that point, however, the court is confident that it can "devise solutions to address that problem."  *Arreola*, 546 F.3d at 801.

### <u>CONCLUSION</u>

For the reasons stated above, and Defendants' Motion to Exclude the Expert Testimony of Mark Ezra [141] is denied without prejudice, and Plaintiffs' Motion for Class Certification [135] is

granted in part and denied in part.  The court certifies the following Class I for breach of express warranty, and Class II for breach of implied warranty of merchantability:

Class I

All persons and entities residing in Delaware, Washington, D.C., Florida, Hawaii, Idaho, Kansas, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, North Carolina, Vermont, Virginia, Washington and West Virginia, who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2002.

All persons and entities residing in Colorado who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2003.

All persons and entities residing in Wisconsin who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2000.

Class II

All persons and entities residing in Alaska, Delaware, Washington, D.C., Hawaii, Louisiana, Nebraska, Nevada, New Jersey, Pennsylvania and West Virginia, who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2002.

All persons and entities residing in Colorado who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2003.

All persons and entities residing in Oklahoma who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2001.

All persons and entities residing in South Carolina who purchased a GL1800 Gold Wing motorcycle manufactured, distributed and/or warranted by American Honda Motor Company, Inc. and/or Honda of America Manufacturing, Inc., on or after October 15, 2000.

Status is set for January 21, 2010 at 9:00 a.m. to discuss, among other issues, class notice and merits discovery.

ENTER:

Dated: December 8, 2009

_____

NAN R. NOLAN
United States Magistrate Judge